**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH C. COULTER, | ) | |
| | ) | CASE NO.  5:12-cv-00281 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Deborah C. Coulter ("Coulter") challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Coulter's claim

for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*.  This matter is before the Court

pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28

U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

### I.  Procedural History

On April 30, 2008, Coulter filed an application for POD and DIB alleging a disability

onset date of April 21, 2006.  Her application was denied both initially and upon reconsideration.
Coulter timely requested an administrative hearing.

On July 9, 2010, an Administrative Law Judge ("ALJ") held a hearing during which
Coulter, represented by counsel, a medical expert ("ME"), and an impartial vocational expert
("VE") testified.  On August 19, 2010, the ALJ found Coulter was able to perform her past
relevant work and, therefore, was not disabled.  The ALJ's decision became the final decision of
the Commissioner when the Appeals Council denied further review.

## II.  Evidence

***Personal and Vocational Evidence***

Age fifty-two (52) at the time of her administrative hearing, Coulter is a "person closely
approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d).
Coulter has a high school education and past relevant work as a waitress, manager-retail, clerk,
manicurist, and cashier.  (Tr. 20.)

***Hearing Testimony***

At the hearing, Coulter testified as follows:

- She is fifty-two years old.  (Tr. 51.)

- She has a high school education, attended two years of college, but never
  obtained a degree.  (Tr. 51.)

- In the past fifteen years, she had worked as a general office worker for a private
  transportation company, an assistant manager at a fabric store, a cashier for a soft
  drink distributor, a manager for a beer and wine drive-thru, a waitress at a fast
  food car-side restaurant, and a manicurist.  (Tr. 51.)

- She was diagnosed with fibromyalgia and neuropathy.  She also experiences pain
  to some degree all the time.  (Tr. 53.)

- For treatment, she sees Dr. Dorman, who prescribed her daily medications and

2

monthly injections.  (Tr. 53-54.)  Dr. Dorman also encourages her to stay active. (Tr. 54.)

• On good days, she likes to be outside, tend flowers, go shopping, or visit her grandchildren, but tries not to "overdo it."  (Tr. 54-55.)

• She tries to walk on a treadmill several times a week.  She can walk for seven minutes at an average pace.  She was also performing therapy exercises related to her knee replacement, this includes riding a stationary bike three times weekly, five to six minutes at a steady pace.  (Tr. 55-56.)

• She believes the heaviest weight she can carry is ten pounds.  She can carry an average laundry basket, but cannot pick up her youngest grandchild who weighs 28 to 30 pounds.  (Tr. 55.)

• She can drive an automobile.  The longest distance she had driven in the past year was approximately forty minutes. (Tr. 57.)

• She believes she cannot work due to difficulty concentrating and forgetting assigned tasks.  (Tr. 58.)

• She cooks, but not on a regular basis.  (Tr. 58.)

• She only needed a cane or a walker when she was rehabilitating her knee after surgery.  (Tr. 59.)

• She navigates the stairs in her house slowly, but tries to limit the number of times. (Tr. 59.)

• On bad days, she does not do anything.  She had four good days in the past month and the rest were all bad to varying degrees.  She does not leave the house on those days unless she has a doctor's appointment.  (Tr. 60.)

• She can sit for ten to fifteen minutes before needing to move around or stand up. She can stand in place for, at most, twenty minutes.  She can walk for twenty to thirty minutes before needing to rest for ten minutes.  (Tr. 61.)

• She goes to the tanning salon three days a week because the heat feels good.  (Tr. 63.)

• During the day she reads or sews.  She can sew for fifteen minutes before needing a break.  (Tr. 63.)

• When sitting, she keeps her feet elevated.  (Tr. 63.)

3

- She does not do housework.  (Tr. 64.)

- She cannot watch her younger grandchildren by herself because they require too much attention and constantly need help.  (Tr. 64-65.)

- She feels her pain levels have worsened since she stopped working.  (Tr. 66.)

- She does not sleep well at night and takes mid-afternoon naps.  (Tr. 66-67.)

The ME testified at the hearing as follows:

- Coulter's only severe impairment is arthritis of the right knee, resulting in total knee replacement surgery on January 28, 2010.  (Tr. 67.)

- Coulter had no severe impairments until July 15, 2009, which is the first mention of problems in her right knee.  Starting on that date, Coulter was restricted to lifting/carrying 20 pounds occasionally and 10 pounds frequently, standing/walking two hours per day, occasional use of right foot controls, never climb ladders, ropes, scaffolds, ramps, or stairs, never kneel or crawl, occasional stooping and crouching, and no exposure to unprotected heights.  (Tr. 68.)

- The aforementioned limitations would be abated by the total knee replacement, but twelve months of records after the surgery were not yet available.  As of April 12, 2010, Coulter would still have been limited to two hours of walking or standing per day.  He would expect her post-surgery condition to last less than twelve months.  (Tr. 68, 70.)

- Dr. Dorman's notes make no mention of trigger points despite containing a fibromyalgia diagnosis.  (Tr. 69.)  Though the ME noted that a "conclusory record sent to the bureau" indicated multiple trigger points, there is no indication of such trigger points in the examination sheets.  (Tr. 70-71.)

- A diagnosis for fibromyalgia requires eleven out of a maximum eighteen trigger points.  There is no indication in Dr. Dorman's records as to how many trigger points were present in Coulter's case.  (Tr. 71.)

The ALJ posed the following hypothetical to the VE:

[A] female, 52 years of age, same educational background and same work experience as Ms. Coulter.  This first hypothetical person can lift/carry 20 pounds occasionally, 10 pounds frequently; can walk six out of eight, can stand six out of eight; no limit on push/pull for foot pedal; could occasionally use ramp or stairs, occasionally use a ladder rope or a scaffold; can constantly balance, occasionally

4

stoop, kneel, crouch and crawl.  This person can constantly reach, handle, finger
and feel; no visual or communications deficits; this person should only
occasionally be around unprotected heights.  And that's it.

(Tr. 76.)

The VE testified that such an individual could perform all of Coulter's past relevant

work.  (Tr. 77.)

The ALJ posed a second hypothetical to the VE:

This person can lift/carry 20 pounds occasionally, 10 pounds frequently; can
stand/walk, combined between the two, a total of two out of eight hours a day,
however, can sit six out of eight; only occasional right foot pedal, no limit on
push/pull; can never use a ramp or stairs, never a ladder, rope, or a scaffold; can
constantly balance, but only occasionally stoop, kneel, crouch and crawl;
constantly reach, handle, finger and feel; no visual limits, no communications
deficits; this person should avoid unprotected heights and workplace hazards.
And that's it.

(Tr. 77.)

The VE testified that such restrictions eliminate all of Coulter's past relevant work in the

light exertional category, but that such person could perform the sedentary work of a manicurist.

(Tr. 77.)   In response to a question posed by Coulter's counsel, the VE testified that an

individual who "cannot sit for longer than 45 minutes, cannot lift or carry more than 10 to 20

pounds maximum, cannot bend/stoop for longer than five minutes, cannot concentrate on task,

can only walk a maximum one hour and cannot drive" would be unemployable.  (Tr. 78.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

5

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[1]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Coulter was insured on her alleged disability onset date, April 21, 2006 and remained insured through the date of the ALJ's decision, August 19, 2010.  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Coulter must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Coulter established medically determinable, severe impairments, due to "fibromyalgia and pain disorder with general medical and psychological factors."  (Tr. 14.) However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 15.)  Coulter was found capable of performing her

---

[1]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

past relevant work, and was determined to have a Residual Functional Capacity ("RFC") for the full range of light work with a few added limitations.  (Tr. 16.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Coulter was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

### *Treating Physician*

Coulter argues that the ALJ failed to set forth valid reasons for rejecting the opinion of her treating physician, Regina Dorman, M.D.  (ECF No. 14 at 8.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*,

8

192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).  Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984).  According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

9

Coulter does not clearly identify which portion of Dr. Dorman's opinion the ALJ improperly rejected.[2]  However, given Coulter's recitation of the medical evidence and summary of the ALJ's opinion, the Court construes the argument as challenging the ALJ's rejection of the functional limitations that Dr. Dorman attributed to Coulter during assessments completed on May 31, 2008 and September 26, 2008.

The ALJ accepted Dr. Dorman's diagnosis that Coulter suffers from fibromyalgia, but rejected the exertional limitations contained in her opinions.  The ALJ explained his opinion as follows:

> I have considered the medical expert's testimony that there is insufficient evidence to support a diagnosis of fibromyalgia.  Specifically, the [ME] testified that a diagnosis of fibromyalgia is supported by tenderness in 11 out of 18 trigger points.  Although Dr. Dorman frequently references trigger points, diffuse pain, fatigue and depression, she does not go into detail regarding the trigger points.  On this point, I accord greater weight to the treating physician regarding the diagnosis of fibromyalgia.  Dr. Dorman has a longstanding history of treating the claimant and I credit her diagnosis.  That said, I do not credit all of the restrictions assessed by Dr. Dorman.
>
> I have considered the opinions provided by treating physician Regina Dorman, M.D.  On May 31, 2008, Dr. Dorman opined that the claimant could sit up to 45 minutes, lift and carry up to 1[0]-20 pounds and bend/stoop up to five minutes.  Dr. Dorman also opined that the claimant's pain prevented left [sic] her unable to concentrate on a task and drive.  Dr. Dorman opined that the claimant could walk no more than one hour max (Exhibit 2F4-5).  Dr. Dorman supported her opinion with treatment records described above.  I note that on the day Dr. Dorman provided her opinion, she did not actually evaluate the claimant.  Dr. Dorman's opinion appears to relate the claimant's own description of her ability to function.  Dr. Dorman's own records do not reflect a rational[e] for such a strict limitation on the claimant's ability to sit and stand.
>
> In a second opinion dated September 26, 2008, Dr. Dorman opined that the

---

[2]  Coulter's treating physician argument focuses mainly on the opinion of the ME rather than Dr. Dorman, and discusses the diagnosis of fibromyalgia – a diagnosis that the ALJ accepted and included amongst Coulter's severe impairments.  (Tr. 14, 19.)

claimant could lift and carry up to ten pounds frequently and 25 pounds occasionally (Exhibits 7E, 7F).  Dr. Dorman also opined that the claimant could stand and walk a total of 1.5 hours in an eight-hour work day, with no more than 15 minutes of standing and 30 minutes of walking at one time.  Dr. Dorman opined that the claimant could sit up to four hours per day, in no more than thirty-minute intervals.  Dr. Dorman opined that the claimant could occasionally [climb], stoop, crouch, kneel and crawl.  Dr. Dorman noted that moving machinery, temperature extremes, noise, humidity and vibration cause neuropathy pain and myalgia flare up.  I concur with Dr. Dorman's assessment of the claimant's ability to lift and carry 25 pounds occasionally and 10 pounds frequently.

I give no credit to Dr. Dorman's opinion regarding the claimant's ability to sit, stand and walk or her environmental restrictions.  Again, this appears to be a reiteration of the claimant's own stated abilities.  Furthermore, Dr. Dorman provided this assessment on the same day that the claimant stated that she had just finished running two households for the entire length of her daughter's pregnancy.  This is inconsistent with an individual who is only able to stand and walk 1.5 hours in an eight hour work day.  I note that when Dr. Dorman provided her opinion, the claimant had not complained of diffuse right knee pain.

(Tr. 19.)

The Commissioner asserts that the ALJ provided legitimate reasons for crediting some of Dr. Dorman's opinions while finding other opinions unsupported by the record.  (ECF No. 16 at 12-15.)  He asserts that the ALJ explained that Dr. Dorman's treatment notes did not contain any complaints from Coulter concerning her knee and that the sitting, standing, walking limitations were simply inconsistent with Coulter's own description of her activities – namely Coulter managing two households and caring for three grandchildren and her daughter during the latter's pregnancy.  *Id*.

Coulter suggests that the ALJ failed to appreciate that objective medical testing is not available to corroborate a patient's complaints in fibromyalgia cases.  (ECF No. 17 at 4.) Coulter is correct that fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'"  *Rogers v. Comm'r of Soc. Sec.*,

11

486 F.3d 234, 244 n. 3 (6th Cir. 2007) (*quoting* Stedman's Medical Dictionary for the Health

Professions and Nursing at 541 (5th ed. 2005)).  Diagnosing fibromyalgia involves "observation

of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and

'systematic' elimination of other diagnoses."  *Rogers*, 486 F.3d at 244 (*quoting Preston v. Sec'y

of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988).  CT scans, x-rays, and minor

abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity."  *Id.*; *see also*

*Preston*, 854 F.2d at 820.  "[P]hysical examinations will usually yield normal results—a full

range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.

There are no objective tests which can conclusively confirm the disease; rather it is a process of

diagnosis by exclusion."  *Id.* at 818.  Individuals suffering from fibromyalgia "manifest normal

muscle strength and neurological reactions and have a full range of motion."  *Rogers*, 486 F.3d at

244 (*quoting Preston*, 854 F.2d at 820).

> Its cause or causes are unknown, there is no cure, and, of greatest importance to
> disability law, its symptoms are entirely subjective.  There are no laboratory tests
> for the presence or severity of fibromyalgia.  The principal symptoms are "pain
> all over," fatigue, disturbed sleep, stiffness, and--the only symptom that
> discriminates between it and other diseases of a rheumatic character--multiple
> tender spots, more precisely 18 fixed locations on the body (and the rule of thumb
> is that the patient must have at least 11 of them to be diagnosed as having
> fibromyalgia) that when pressed firmly cause the patient to flinch.  All these
> symptoms are easy to fake, although few applicants for disability benefits may yet
> be aware of the specific locations that if palpated will cause the patient who really
> has fibromyalgia to flinch.  There is no serious doubt that [the claimant] is
> afflicted with the disease but it is difficult to determine the severity of her
> condition because of the unavailability of objective clinical tests.  Some people
> may have such a severe case of fibromyalgia as to be totally disabled from
> working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of
> Rheumatology)," 310 British Med. J. 386 (1995); *Preston v. Secretary of Health
> & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (*per curiam*), but most do
> not and the question is whether [claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996)

12

While the ALJ does note the absence of positive clinical findings, the ALJ did not reject Dr. Dorman's opinion that Coulter suffers from fibromyalgia, nor does it appear that the purported standing, sitting, and walking limitations were rejected based on a lack of corroborating objective clinical tests. Furthermore, the ALJ was not required to adopt Dr. Dorman's standing, sitting, and walking limitations simply because he credited Dr. Dorman's fibromyalgia diagnosis. Instead, reading the ALJ's opinion as a whole, he offers three primary reasons for rejecting the aforementioned limitations. First, the ALJ notes that the limitations Dr. Dorman ascribed to Coulter appear to simply reiterate Coulter's complaints on the date the opinion was given with no examination. (Tr. 19.) Second, nothing in Dr. Dorman's records supports such a strict limitation on sitting, standing or walking.[3] *Id.* Finally, the ALJ noted that Coulter's self reported activities were inconsistent with an ability to stand/walk only 1.5 hours in a workday.[4] *Id.*

The ALJ did not reject portions of Dr. Dorman's opinion because he misunderstood fibromyalgia or because objective medical testing failed to corroborate fibromyalgia or its symptoms. Reading the opinion as a whole, Dr. Dorman's standing, walking, and sitting restrictions were rejected because they were based on Coulter's self reported limitations – limitations that the ALJ found incredible based on Coulter's description of her activities in the

---

[3] In separate portions of the opinion, the ALJ points out that Dr. Dorman noted Coulter had a normal gait in June of 2007, and January of 2008. (Tr. 17.) He also notes that in September of 2009, Dr. Dorman believed Coulter needed to improve her level of exercise. (Tr. 18.)

[4] It also bears noting that Dr. Dorman's opinions regarding Coulter's standing/walking limitations pre-date July of 2009. According to the ME, this date marks Coulter's first complaints of right knee pain. (Tr. 67.) It also marks the beginning of the time period she received treatment from Raymond W. Acus, M.D. (Tr. 292-98.)

13

treatment notes.  Because objective medical evidence corroborating allegations of pain in fibromyalgia cases will most likely be minimal, even greater emphasis is placed on the credibility of a claimant's subjective allegations regarding the severity of her pain.  The credibility determination in fibromyalgia cases is of "paramount importance" because its symptoms are entirely subjective.  *See, e.g., Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 960 (N.D. Ohio 2003).

> Since the presence and severity of fibromyalgia cannot be confirmed by diagnostic testing, the physician's opinion must necessarily depend upon an assessment of the patient's subjective complaints.  This places a premium, therefore, in such cases on the assessment of the claimant's credibility.  Although the treating physician's assessment can provide substantial input into this credibility determination, ultimately, the ALJ must decide, given the factors set out in the regulations, if the claimant's pain is so severe as to impose limitations rendering her disabled. For purposes of judicial review, the ALJ's articulation of the reasons supporting his credibility findings becomes very important.

*Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003).

Coulter has not argued that the ALJ's credibility analysis was deficient.  An ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  In addition, pursuant to 20 C.F.R. § 404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion....  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  The ALJ found that Dr. Dorman's records failed to provide a rationale for a strict limitation on Coulter's ability to sit, stand, and walk.  This finding is tantamount to a finding that Dr. Dorman failed to provide adequate

14

explanation for her opinion. Coulter does not point to any evidence of record that renders this finding unreasonable. As such, under the rules, it was not inappropriate for the ALJ to discount Dr. Dorman's opinion in that she failed to explain the basis for it. Therefore, the Court finds that the explanation and reasons provided by the ALJ are legally sufficient to reject the identified portions of Dr. Dorman's opinion.

### Degenerative Joint Disease of the Right Knee as a "Severe" Impairment / Past Relevant Work

Coulter takes issue with ALJ's finding that her degenerative joint disease of the right knee did not constitute a severe impairment under the regulations. She argues that the ALJ's failure to find her condition severe is reversible error. (ECF Nos. 14 & 17.) In a related argument, Coulter asserts that the ALJ's conclusion – that she could perform her past relevant work – was not supported by substantial evidence. (ECF No. 124 at 12-14.) The ALJ found that Coulter's degenerative joint disease of the right knee with status post total knee replacement was not a severe impairment as it was not expected to last twelve months. (Tr. 20.) He further rejected the ME's opinion regarding Coulter's ability to stand and walk. (Tr. 19.)

Coulter's argument appears to contain two elements. First, Coulter challenges the ALJ's finding that her knee impairment was non-severe because it lasted less than twelve months. Second, Coulter challenges the factual finding that her knee impairment did not last twelve months. As to Coulter's first argument, the ALJ expressly stated that he did not find Coulter's right knee impairment to constitute a severe impairment because it did not last for a full twelve months. (Tr. 14-15.)

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007), intended to "screen out

15

totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Nonetheless, if the ALJ finds at least one impairment to be "severe," he must move on to the subsequent steps in the evaluation. He is not required to continue to analyze the remainder of the claimant's impairments to determine whether they too are severe. "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does "not constitute reversible error." *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009) (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Hickox v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 87813 at *13 (W.D. Mich. Aug. 2, 2010) ("The finding of at least one severe impairment is sufficient to trigger further analysis. The ALJ's failure to find additional severe impairments at step 2 is 'legally irrelevant.'") (*quoting McGlothin v. Comm'r*, 299 Fed. Appx. 516, 522 (6th Cir. 2008)).

The ALJ appears to believe that an impairment which does not last twelve months is necessarily "non-severe." Though not addressing the issue squarely, 20 C.F.R. § 404.1522(a) states as follows: "[i]f you have a severe impairment(s) and then develop another unrelated severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months." By inference from the regulation, an impairment need not last twelve months to be "severe" within the meaning of the regulations. Nonetheless, if the ALJ's finding that said impairment did not last twelve months is supported by substantial evidence, any error is harmless. *See, e.g., Hines v. Astrue*, 2012 U.S. Dist. LEXIS 67931 at **30-32 (D.N.H. Mar. 26, 2012) (finding the ALJ committed harmless error when he determined that claimant's fibromyalgia was non-severe due

to failure to meet the twelve-month durational requirement); *Karlix v. Barnhart*, 457 F.3d 742, 746-47 (8th Cir. 2006) (ALJ's erroneous finding that claimant's impairment did not meet Listing considered harmless where evidence showed that claimant nevertheless failed to meet twelve-month durational requirement).  Therefore, if Coulter's knee impairment: (1) did not last twelve months; *or* (2) did not prevent her from standing/walking for at least six hours in an eight-hour day, the failure to designate the impairment as "severe" would be harmless.

The ALJ specifically found that the ME "testified that the claimant's degenerative joint disease of the right knee was not an impairment for twelve months.  I concur."  (Tr. 15.)  In her Reply, Coulter asserts that her knee impairment, which began in July of 2009, actually lasted until late December of 2010.  (ECF No. 17 at 3.)  Coulter bases this argument on the ME's testimony that he expects Coulter to be able to stand and/or walk in an unlimited fashion before the end of 2010.  (Tr. 70.)

It is undisputed that as of July 2009, Coulter began complaining of pain in her right knee.[5] (Tr. 295.)  It was the ME's opinion that as of July 15, 2009, Coulter could only stand/walk for two hours a day.  (Tr. 68.)  On December 7, 2009, Coulter's treating orthopaedic surgeon, Raymond W. Acus III, M.D., opined that Coulter had failed conservative treatment for her severe right knee problems and recommended a total knee arthroplasty (TKA), which was performed on January 28, 2010.  (Tr. 446-49.)  On March 26, 2010, Dr. Acus noted that Coulter was "doing well," x-rays showed that her patella was "tracking beautifully in the groove," but that she had less than perfect flexion.  (Tr. 438.)  On April 12, 2010, Dr. Acus opined that

---

[5]  The hearing occurred on July 9, 2010 – just a few days shy of one year from the time the ME opined Coulter first began suffering from a knee impairment.  (Tr. 12.)

17

Coulter was doing well, that her knee was neurovascularly intact, and that she was "walking well almost without a limp." (Tr. 436.)  Dr. Acus indicated that he was "very pleased" with her progress and that Coulter should continue on aggressive physical therapy three times per week. *Id*.  The ME testified that as of April 2010, Coulter could still only stand/walk for two hours in an eight-hour workday.[6]  (Tr. 68.)

Although the ALJ purports to rely upon the ME's testimony in arriving at the conclusion that Coulter's right knee impairment was not severe for twelve months, the ME's testimony does not support such a conclusion.  While noting that twelve months of medical records were not available after the knee surgery, the ME opined that it will not take Coulter a full twelve months to recover from the January 2010 knee surgery.  (Tr. 68-69.)  However, according to the ME, Coulter had already been severely limited in her ability to stand/walk for the six months leading up to the surgery.  In April of 2010, four months after the surgery (and ten months after her standing/walking limitations began), the ME continued to express the opinion that Coulter was limited to two hours of walking/standing.  (Tr. 68.)  Though the ME opined that Coulter would be unencumbered in her ability to stand/walk less than twelve months *from the time of the surgery*, he did not opine that she would be able to stand/walk without limitation by July of

---

[6]  The Commissioner asserts that the ME's testimony – that Coulter could walk/stand for two hours in July of 2009 – is consistent with an ability to perform light work.  (ECF No. 16 at 11.)  This assertion is untenable.  "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs....  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  Social Security Ruling ("SSR") 83-10.

2010.[7]

Nevertheless, even if the ALJ's interpretation of the ME's testimony as it relates to the duration of Coulter's right knee impairment is unsupported, that issue is moot based on the ALJ's explicit rejection of the ME's standing/walking assessment. The ALJ stated that "[he] do[es] not concur with the medical expert's opinion regarding the claimant's ability to stand, walk ...." (Tr. 19.) Although an ALJ is procedurally required to give good reasons in a decision for the weight given to a claimant's treating source, "this requirement only applies to treating sources" and not to non-treating or non-examining sources such as an ME. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010), *citing Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Moreover, as explained below, the ALJ's rejection of the ME's standing/walking assessment was harmless error.

The Court finds no merit in Coulter's argument that the ALJ finding she could perform her past relevant work was not supported by substantial evidence. (ECF No. 124 at 12-14.) Even if the Court assumes that the ALJ erred by: (1) finding Coulter's right knee impairment did not last for twelve months; *and* (2) rejecting the ME's opinion that she could only stand/walk for two hours in an eight-hour workday, such errors were harmless. "When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'" *Kobetic v. Comm'r*, 114 Fed. Appx. 171, 173 (6th Cir. 2004) (*quoting NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand

---

[7] Though the ALJ's opinion does not expressly say, it appears the ALJ, in stark contrast to the ME, only began considering Coulter's knee impairment from the date of the surgery rather than from July of 2009.

19

a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

In *Pratt v. Astrue*, the District Court for Eastern Tennessee found that even if the ALJ erred by finding the claimant retained the RFC for the full range of medium work, such error was harmless. 2009 WL 2516981 at *12 (E.D. Tenn. Aug. 14 2009). The *Pratt* court explained that if the ALJ had accepted the postural limitations found by a physician, which were inconsistent with the full range of medium work, those limitations would not have precluded the claimant from performing a full range of work at the light and sedentary levels, which included her past relevant work as a receptionist. *Id* at **12-15; *accord Taylor v. Astrue*, 2012 U.S. Dist. LEXIS 11307 (D. Md. Jan. 31, 2012) ("even if the ALJ erred by failing to find any exertional limitations stemming from Plaintiff's heart condition and cataracts, the error was harmless because the ALJ based his ultimate disability determination on a finding that Plaintiff could return to light, unskilled work, which was supported by substantial evidence."); *see also Riley v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 20961 at *26 (S.D. Ohio Feb. 21, 2012) (finding the ALJ's failure to include certain limitations in the RFC was harmless error where claimant could still perform her past relevant work despite those limitations.) Similarly, in *Pelfrey v. Astrue*, the Eastern District Court for Kentucky explained that the ALJ's finding regarding the lack of "severe" impairments was harmless error, because the restrictions assessed by a physician were provided to the VE, who, in turn testified that claimant could return to her past relevant work even with said restrictions. 2010 U.S. Dist. LEXIS 45496 (E.D. Ky. May 10, 2010) (finding that plaintiff did not carry her burden of showing she could not return to her past relevant work.)

In the case at bar, the VE was provided a hypothetical that included the sedentary

standing/walking restrictions assessed by the ME. The VE testified that such a person could perform Coulter's past relevant work as a manicurist, which is sedentary. (Tr. 75, 77.) Although the ALJ did not limit Coulter to sedentary work in his ultimate RFC finding, he did expressly find that she could perform her past relevant work as a manicurist. (Tr. 20.) Therefore, even if the ALJ erred in his RFC finding, any error was harmless as Coulter failed to meet her burden at Step Four of showing that she could not return to her past relevant work. *See Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error in RFC determination is harmless if it does not affect his ultimate conclusion as to disability). As such, Coulter's second and third assignments of error are without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: November 8, 2012